Good afternoon, Your Honors, Chief Judge. I'm Chris Arment. I represent Plaintiff, the appellant, Cindy Lee Garcia. With me is Mr. Armstrong, my colleague from Montana. Cindy Lee Garcia is an ordinary woman surviving under extraordinary circumstances. After YouTube hosted the film trailer that contained her performance, she received the following threats. In writing. Record at 218. Are you mad, you dirty bitch? I kill you. Stop the film. Otherwise, I kill you. Record at 212. Hey, you bitch, why you make the movie Innocence of Muslim? Delete this movie. Otherwise, I am the Mafia Don. Record at 220. I kill whoever have hand in insulting my prophet. Last one. Record at 217. Not the last threat, just the last one I'll read. Oh, enemy of Allah, if you are insulting Muhammad, prophet's life will suffer forever. Never let you live it freely. Sore and painful. Wait for my reply. Counsel, how do those threats go to the preliminary injunction standard? They go to the issue of irreparable harm, Your Honor. And the issue being that she needs to show under the preliminary injunction standard some harm other than simply a copyright harm. And that comes from the slight change in modification that we saw in the standard in the Ninth Circuit after eBay. And in her case, there's something more that she can show, is that she is under threat of death if she is not successful in removing the movie. May I ask you, of course, we take those threats very seriously, but her sole remaining claim in this court is a copyright claim, is that correct? That is correct, Your Honor. And if there's a determination that she's unlikely to succeed in her copyright claim as the district court determined, then how do the threats weigh in? She would still have a, if she doesn't have a copyright claim, how would the threats weigh in? They would weigh into a continued case against the filmmaker and others who made the film, and that case is proceeding in the district court. But we're solely here on the issue of preliminary injunction. And not only as to the threats, but there are other issues that weigh into the balance of equities, the public interest. Well, it hasn't really answered my question. If we were to determine that she is, the district court was correct and did not abuse its discretion in determining that she is unlikely to succeed on her copyright claim, then would you explain how, in your view, this balance of harm works in light of failure to succeed on the merits of the claim? If this court determines she's not likely to succeed on the merits, then the preliminary injunction would be denied. We would have a direct copyright claim still against the defendants, both the secondary and the primary. And we would do our best to convince the trial court, based on the facts then, that she does, in fact, have a copyright claim. Could I then ask you about the copyright claim? As I understand it, your copyright claim, the work you're claiming is her dramatic performance, correct? The dramatic performance, which was fixed to film in the three and a half days that she filmed on the set of Desert Warrior, as explained in her declaration. With regard to the fixation, this is where I would appreciate your explanation, because generally fixation is attributed to the author, but did she actually do anything in terms of fixation? Our view is that she did, in fact, authorize the fixation of her performance. When she showed up in front of the camera voluntarily, no matter who was holding the camera, or if it was on a tripod, or if here it's on a wall, one authorizes the fixation of their performance on that film. And that is what she did. The performance issue and the copyright issue goes to the second prong under 102 of the Copyright Act, which is not just fixation, but is it an original work of authorship? What do we do then when you talk about a work? Because actually work, authorship, and fixation are integrated in the determination under the Copyright Code, with the Copyright Office basically saying that the motion picture is a single integrated work. And at least up to now, I don't know of cases where someone can claim to slice out a piece merely by participating in an integrated performance. What is your best authority for us to take that position? I would tell you, Your Honor, that the converse is true. Actually, yes. A motion picture can be a joint work. It can be a collaborative work. Let's start there. But you've disclaimed it as joint authorship, correct? Correct. She's not claiming authorship. Joint authorship is not here? No. All right. What she's claiming is authorship in the performance that she delivered over three and a half days on the film Desert Warrior that was fixed to film at the time that she delivered it. And courts all over have given us instructions on why her performance or something that seems minimal in creativity. Of course, the court doesn't have the benefit of seeing the three and a half days of her performance, only the snippet that was taken and put on the trailer and uploaded on YouTube. But the Supreme Court has been very instructive in this. Looking solely at the few seconds that were taken and put on the trailer in YouTube, the Supreme Court told us in Feist that the issue is that the work possess at least some minimal degree of creativity. The requisite level of creativity is extremely low. Even a slight amount will suffice. It just has to possess some creative spark. So what I would say is what this court is challenged to doing is looking at her performance, which we've provided to the court, and does it meet the Supreme Court standards, either in Feist or in Blyston? Does it commend her? We lay rest to that to some degree in the Malcolm X case, although it related to joint authorship. It was really looking at authorship. And this segmentation, we basically said if you define author in that way, you're basically, you know, anybody who shows up practically, the busboy who serves the drinks, the dramaturge, everybody has a slice of the pie, and that that's not what the copyright law intended. Well, it's possible they have a slice of the pie, but it becomes a distinction without a difference, because you show up to be the busboy in the scene when Harry met Sally, and that person impliedly consented to give their performance. So we never get to this challenge or this issue. There's normally in that kind of a case an implied consent for that performance. So you're not going to see someone who's rowing a boat away from the Titanic complaining. They showed up on the set. They performed in that film. There also has to be an issue of creativity. Was it sufficiently creative? Well, you know, if you take the battle scenes, for example, in The Lord of the Rings, in your view, does every single person who made a cameo in the battle scenes have a copyright interest in their performance as fixed in the film? It may be. I would say that yes to the extent they make the Supreme Court standard. However, it doesn't end up mattering that much in the film industry, because either people sign agreements or they impliedly consent their performance by being in the battle. The only folks this is really going to affect, if we say Cindy Lee Garcia has a copyright interest in her performance and therefore it should be enjoined off of YouTube, are those filmmakers who decide with bad intent in their heart from the beginning to go out and defraud people and to break the law, which this filmmaker did, and lied to her about what she was going to be in. That sounds like a fraud or right of publicity or some other kind of claim, not a copyright claim. So where am I missing? I'm missing the link that you're trying to provide. What I would say is that fraud in the inception, an implied license is about a contract. So that contract can be set aside if there's fraud in the inception. In this case, Mr. Nakula, not only did he lie to the actors, but he lied about what his name was, and he used the Internet. He was ordered by the court order, Judge Snyder in his criminal hearing when he was released on bail or when he was released after he served his time, he was court-ordered that he was not allowed to use the Internet, he was not allowed to use a false name, and he was not allowed to misrepresent himself. So if all of those things were not there, then she wouldn't have a copyright. But now you're saying if you add all those things, then this is sort of a we should protect that. But then what courts are going to then people that you're saying, like the people in the battle scene, that wouldn't be them. But what if they got lied and they thought they were going to be in Lord of the Rings, but then it ends up somewhere else? If they affirmatively got lied to, I think that is an issue that goes to the validity and the scope of the implied license and what it is. In this case, it goes even further because this wasn't just a lie. But we have to say that this was a work, right, for you to prevail. Absolutely, yes. Okay. So where, but then we would have to, but you're saying don't worry that it's not going to create a whole lot of works that aren't works now because this one's sort of a one-off or you're not going to see this again or something like that. I recognize it might seem troubling to call maybe the oarsmen in Titanic having created a work, but unfortunately or fortunately, that's what Congress said when they passed the 1976 copyright. Well, they didn't say that. Here's what they said. They said a work is created when it is fixed. It's fixed when it's a, and this is from the statute itself, in a tangible medium of expression. When it's embodiment, by or under the authority of the author, sufficiently permanent or stable to be perceived. Nowhere in the Copyright Act, nowhere did Congress say except for when we're talking about motion pictures, it has to be the whole thing or it has to be a certain length. Those impositions that, those conditions are not in the 1976 Act. The 1976 Act is very specific with its definitions. It defines fixed. It defines creative. It defines audiovisual work, and here's how it defines it. One of the specific things that is protected under the Copyright Act, a series of related images intrinsically intended to be shown by the use of machines. Nowhere does it say motion picture has to be a certain length or when it is an AV work, we're only going to protect those AV works, which are also motion pictures. Doing that would be reading something new into the Copyright Act. So how do I get around al-Muhammad, where al-Muhammad says, where there is a work that incorporates many creative contributions but is intended to be unitary, a mere creative contribution is insufficient to confer authorship over the whole work. Al-Muhammad is very simple to reconcile. Just to address my, because that came right out of al-Muhammad. I mean, it seems to me that your argument has been that the performance was the copyrightable thing when we looked at your complaint. And then when we get to the briefing, and I think especially helped by the majority opinion, now it's not only a performance, but it's a performance in, if you will, a tangible medium of expression. But you still haven't overcome the authorship, nor have you overcome the existence of the work. So I'm going to the authorship, because you've been asked about the work. Would you like me to go authorship or al-Muhammad first? Well, it was al-Muhammad, which is about authorship. Al-Muhammad is about al-Muhammad's claim that he wanted equal and joint credit in the entirety of the film. He did not. If al-Muhammad had come in and said, I want credit over the few script pages, the writings that I authored, it would have been an entirely different case. But he wanted credit because he sat on Spike Lee's shoulder and told him how to do certain things and certain cultural issues. He wanted to get equal credit, joint credit in the entirety of the motion picture. Cindy Garcia is very different. What she's saying is, for instance, I wrote these script pages, or I performed these three and a half days on film. That's what I own. Al-Muhammad is very different, Your Honor. Well, if I see al-Muhammad just a little bit different, then I guess that's why I ask you the question. It seems to me that that case says where there is a work that incorporates many creative contributions but is intended to be a unitary, a mere creative contribution is insufficient to confer the authorship over the work. And so, therefore, in your particular situation with your client, a mere creative contribution would be insufficient to confer the authorship. Of course, that assumes that you call her performance fixed to a tangible meaning expression, a mere creative contribution. I disagree with that. I also believe that had al-Muhammad said, I want a script credit or I want those pages that I wrote, I want them to acknowledge that those are mine. That's not what he was doing. He was asking for ownership in the whole thing. What I will tell you is this. Because Ms. Garcia showed up for Desert Warrior, she could have absolutely no complaint if her Desert Warrior performance was incorporated into a larger motion picture. That would be the unitary work. Where the district court erred here is it mixed up which was the film and which was her performance. Desert Warrior film. The district court assumed that The Innocence of Muslims was the film. It was not the film. It was not what gave rise to her copyright interest. What gave rise to her copyright interest was her expression, her emotion. Everything she did during those days that she performed. It needs to be fixed. If she's just singing on the street, she doesn't get a copyright for that. Correct. If she's dancing down the street and saying the same words, she has no copyright. Agreed. My question really though, now going to your implied license and following up on Judge Smith, where is it in the record we look to find that somehow she put some restrictions on the license? Because the district court found there was a non-exclusive implied license. Right. I would direct the court to Ms. Garcia's declaration where she talks about the dealings that she had with Mr. Basile and what they were. And what she said at page 193 of the record is that she was cast for a film called Desert Warrior. That was the film she was cast for. So even if she had a written agreement and let's say she was cast for the film Desert Warrior, it would be a strange world indeed if there wasn't a license that was broad enough to say you could use my performance in anything else, if then they used that in something completely different. Which had a working title of Desert Warrior. So the way you're saying is they changed the title, then they changed the implied license? Well, it would be one thing. We have to get down to some practicality of how you make films. Often someone shows up and says this is a working title. Right. And she says that in her declaration, this was the working title. Turned out not to be the title. She says, I auditioned for and was cast in a supporting role in Desert Warrior. It was always called Desert Warrior. There was no contemplation and Google submitted no evidence whatsoever that this was simply a working title.  There was no language that was offensive. The working title words come from her in her declaration. I'm not sure I agree with that, Your Honor. Maybe I misread this, but it says, I responded to a casting notice for a film with a working title of Desert Warrior. No, Your Honor. I'm sorry to disagree, but at record 193, she says, I auditioned. She says, I responded, paragraph 5, line 19. She says working title. I mean, I didn't make it up. It's the words you're using and she's using. I'm just looking at her declaration. She does use those words. She does use the words Desert Warrior throughout. She had a conversation specifically. It would be different if she didn't have a conversation specifically. But she recounts the conversation she specifically had about the content of the film at paragraph 10 of her declaration. So he made affirmative misrepresentations to her because that's not ultimately what the film ended up being. What about the Copyright Office rejection of her request for copyright protection? Right. Well, of course, the Congress contemplated that the Copyright Office could be wrong. And that's why it said that if the registrar refuses registration and a court of competent law in an appropriate jurisdiction later orders that there is a copyright interest, the copyright registrar should, in fact, register it. The Copyright Registration Office is not the last word. It's entitled to a certain deference if this court finds it persuasive. Is that reviewable by the Federal Circuit? Yes, Your Honor. And has it been reviewed? Has it been appealed? I don't know what you do. No. Where does it stand? No, the way it works now is that the minute the case was filed, within six days, the Copyright Office was notified of the existence of this case. They were also notified in writing of the Ninth Circuit opinion. They've not chosen to intervene in this case, although they've had ample opportunity to. The question I had is whether the ruling of the Copyright Office is subject to review in the Federal Circuit. I assume it's the Federal Circuit that will review it. It is. We're still in the internal appellate process at the Copyright Office at this point. I see. That's where it currently stands procedurally. Just to be clear, what was submitted for copyright registration then was the segment of her performance that appears in the Innocence of Muslim films? It was the only portion that was available to Ms. Garcia, and so she described it in the copyright application as to, however, her performance in the film Desert Warrior. And in the district court, I will tell you, we're doing our best to get the entirety of the performance, but you can imagine discovery against Mr. Nakula is not as simple as one would think. So she didn't present the fixed form. She just presented the description. A piece of the fixed form and the description at this point. Thank you. Yes, Your Honor. I see that I have 10 minutes. I'd like to reserve the balance for rebuttal. Thank you. Thank you. Thank you, Chief Judge Thomas, and may it please the Court. My name is Neil Katyal, and I'm here to represent Google and YouTube, and there are three reasons why the district court's denial of the preliminary injunction in this case was correct. First, the standard of review, the Supreme Court in winter said that Ms. Garcia must make a, quote, clear showing that she is entitled to relief, and we don't think that's been met. And second, Ms. Garcia faces a triple ratcheting up of that already demanding standard. The panel entered an injunction that gags speech, which this court in Overstreet says gets heightened scrutiny. The panel had to conclude the district court abused its discretion, something it couldn't do. And the panel entered a mandatory injunction. And third and finally, the panel's decision here, its merits analysis, creates a new category of copyright interest that threatens to turn a unitary work, such as a motion picture, into a patchwork of overlapping property claims. Did the panel decision make any mistakes from your perspective about the standard of review on mandatory injunctions? Well, I don't know that it was actually addressed by the panel decision. We certainly think that the Judge Smith dissent, which led with the mandatory injunction argument, is correct. That is, this is a change in the status quo, and under this Court's decision in Stanley and Park Village, it should be entitled to that form of review. It's not just, of course, Judge Callan, the mandatory standard piece of this mandatory injunction. It's all of these things together. I think most importantly, Judge Berzon's decision in Overstreet is important here. Because the opinion for the Court in Overstreet says, quote, when there's at least some risk that constitutionally protected speech will be enjoined, only a particularly strong showing of likely success and of harm to the defendant as well could suffice. And here we submit that even just under the ordinary winter standard, in which the Supreme Court has said preliminary injunctions are extraordinary remedies and should only be reserved for special circumstances, when you add that to, I think, the debate about any of these four prongs, I think we have what I think is a fairly clear case that the district court decision should be affirmed. It seems that the mandatory injunction was predicated on the district court's abuse of discretion. Hypothetically, if we were to determine the district court did not abuse its discretion, would the mandatory injunction, just as a matter of course, fall out then? I don't think so. I think that the decisions in Park Village and so on don't turn on abuse of discretion as much. I think the idea behind the mandatory injunction kind of ratcheting up of the standard is to say when a Federal court is changing the status quo in a dramatic way, well, that's something it should only do when the facts in law are absolutely clear. And here we don't get that. I understand. I guess maybe my wasn't probably clear. You first have to look at the district court's decision. If you determine that the district court didn't abuse its discretion and then the injunction should be denied, my question was whether then per force the mandatory injunction just falls by the wayside. Yeah, I think at that point if you decided that the district court's decision was correct and not an abuse of discretion, I don't know that you need to get into the mandatory injunction piece. We do think, Judge McHugh, and for reasons that you were saying to my friend Ms. Armenta, we think that the merits of this are really damaging of the panel opinion and they should be, the vacation of that panel opinion should continue. And the reason for that is exactly what you were saying. There is no precedent, zero, for the idea that this, that a five-second performance is itself a separate copyrightable work. You asked Ms. Armenta to provide you a case. There's no case that says that. What about the AVP Treaty? The AVP Treaty? So the treaty that the nation... The one we just signed. Right, exactly. So I was, you know, my statement is there's never been a case, so this would be a real change. I wasn't disagreeing with you. And I don't think that the treaty itself, Judge Kaczynski, answers that question. It just simply says that performances can be copyrightable. We don't disagree with that. Well, isn't that the question? Well, no, I don't think that with due respect that that's the question, because we agree that a performer could have a copyrightable interest in a film. It's normally as a joint author, as Judge Murguia of the Copyright Office said. Performers sometimes can exercise enough control so that they are joint authors. And, of course, the treaty hasn't been ratified by the United States Senate. It only goes into effect when 30 countries ratify only six. The last sheet says compatibility with U.S. law. It says that under U.S. law, actors and musicians are considered to be authors of their performances, providing them with copyright rights, which sounds to me less like they can have it, but it seems to be a categorical statement that they do have it. Were we fibbing there? Judge Kaczynski, we're, again, not disagreeing with that. The actors can have copyright interests in their performances. It doesn't say can. This says does. You said can. I said no, the language says does. And you came back and you said can, as if you're agreeing with me. You're not going to fool me that way. So why don't you try answering the question in the terms it's asked, rather than rephrasing the question and answering a different question. Now, let me read it to you again, just so you don't have a mistake about what it says. The fact sheet, which talks about compatibility of U.S. law with the treaty that we just signed, says under U.S. law, actors and musicians are considered to be authors of their performances, providing them with copyright rights. It doesn't say can, may, could. It says do and have. So I'm asking you about why does this apply to Cindy Ligasier? So two things. Number one, even reading everything at face value, and there are reasons why we think you shouldn't, but even reading at face value, all that would mean is that she's a joint author. You're not a textualist? You're not a textualist? I'm certainly a textualist. It doesn't say anything about joint authorship. It talks about considered authors of their performances. It doesn't say joint authors of an entire work, right? It's inconvenient language, right? Your Honor, it doesn't say anything one way or the other about the type of interest that that authorship holds, and certainly the Copyright Office. I'm sorry. Can you point to me where there's ambiguity? What's ambiguous about this? It says under U.S. law, actors and musicians are considered to be authors of their performances. Now, where's ambiguity there? Well, my point is that I think that the type of authorship that they're talking about, in order to be consistent with the expert body here, which is the Copyright Office, as opposed to the PTO, which is what you're reading from, Judge Kaczynski, which I don't think has any special expertise in copyright, the Copyright Office. If you want to disagree with it, that's fine. If you want to say they're wrong, they misrepresented, that's your prerogative. I'm saying I think we should read it in the most charitable way to the PTO, which is to say that they meant joint authorship there, because that is the way that, I think, they don't say joint authorship of their entire work. They, in fact, are considered to be authors of their performances, providing them with copyright rights. And, Judge Kaczynski, if we want to get into the question of which agency we should defer to, every single day of the week, this side will win that, because the Copyright Office said we ought to. If you want to get into that, that's fine. But right now I'm focusing on the language. Now, if you want to say the language does say that, and they are wrong, it's the wrong agency, we can go on to that discussion. But I really do want you to speak to the language. And you want to, I hear you claiming that this has something to do with joint authorship of the entire work, and I just don't see where in this language there's room for that interpretation. Well, here's my position. I think you could read it the way I'm saying. You certainly could read it the way you're saying. We don't think it matters one way or another, because that's the way it is. Well, explain to me how it could be read the way you're saying. Because I think that when they say authorship, they mean joint authorship. But they don't. They say in their performances. It actually says in their performances. I don't see how you can read that as saying in the entire work. Well, because I think that's the way everyone has read motion pictures and actors to be contributed from the Copyright Office to the legislative history in Congress and so on. Mr. Katyal, I know you're a textualist. Why don't you think it matters? I didn't get to hear your response. Exactly. We don't think it matters, because at the end of the day, that is language interpreting a treaty that has not been ratified. It's only been ratified by six countries, not the United States, Syria being one of them. It only goes into effect when 30 countries ratify it. So I don't think that we should be worried about this particular language. If we actually care about what the U.S. Government's agencies have said about this specific issue, you have, Judge McGee, as you were saying, a letter from the Copyright Office on registration that says our longstanding position has been that an actor's performance cannot be a separately copyrightable work. And the danger of the panel opinion, if allowed to proceed, is that you will fragment copyright law, as Judge McGee, when you were saying, into a thousand different possible claims, every possible actor. And my friend, Ms. Armenta, admitted that. She said any actor, any extra in the Lord on the Rings could bring now a lawsuit. Let me ask you, following up on Judge Kaczynski, assuming someone is not a joint author, what are the other ways that someone who participates through performance in a movie could obtain copyright? So we think that sometimes an actor could be, could have the requisite amount of creative control to be a sole author. So, for example, if Chris Rock... Okay, so you could be a sole author. But also you could be, for example, an independent contractor with an independent copyright interest, and you license it to the film people, and it gets integrated, right? Absolutely. And you would have, you meaning the author, would have a copyright interest. That's correct. And that goes to the definition of work. So basically, in that circumstance, I guess you could imagine like Celine Dion sings a song for Titanic, and she intends it to be both a separate standalone work, as well as integrated into this overall movie. In that circumstance, she could retain a copyright interest in there. Now, why is that? Because the definitions of collective work and joint work give us, I think, strong textual clues that when someone stands up and does a joint work, it's not a work. So a work, we think, is defined by the text of the statute in Section 101. I'm sorry. I don't understand the distinction. Why Celine Dion get a separate interest, and Laurence Olivier doing To Be or Not To Be in Hamlet not, I mean, it could be a standalone performance, right? You could put it on YouTube. Because, Your Honor, it turns totally on the intent of the parties at the time. So here's the definition of joint work in 17 U.S.C. 101. Quote, a joint work is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. Now, when Ms. Garcia took her five-second performance, she was intending precisely that, her contributions be merged into inseparable or interdependent parts of a unitary whole. I want to go back. I want to just find out if there's any hole here. If you're not a joint author, and you're not an independent creator that licenses your copyrighted work, and you're not a collective work owner, and you're not a sole author, are you saying there's no other way for a performer to have a copyright? I think that they probably wouldn't have a copyright. She would, of course, have claims about fraud and business. I know. I'm just asking. Your answer is you're absolutely sure there's no other copyright? There's no other category under which a performer could claim that. One doesn't come to me at this moment. You know, it's not before the court, and I don't think it matters to our position, but one's not coming to me right now as one. I mean, our overall position on work is that, as the amici, I think, a wide-ranging group of amici are warning you, that if you adopt this definition of work, you do fragment copyright law into thousands of claims. As I was saying, Ms. Armenta admitted that every extra in Lord on the Rings could sue, and her exception was, well, there'd be an  But Judge Kallen, I don't think that's the case. As you pointed out, anyone can assert that they were the subject of fraud, of mistake, or so on, and then force a federal lawsuit and a And the grave harm, as the amici are pointing out, from that circumstance is that intermediaries, whether they be big ones like YouTube or smaller ones like the media, media organizations, are going to have to take down that information because they're too afraid of the liability concerns that would otherwise adhere whenever there's an accusation of fraud. And we certainly don't mean to minimize in any way what that harm is. So what's the fear here? The fear here is that anyone, if you adopt her theory, anyone could allege a mistake or fraud. That's right. And then this is not a take-down notice under Section 230. This is that she goes to court and gets an injunction. How is that different from anybody else getting an injunction? I mean, it's not like they have to be in fear that if they get it wrong, they'll be held liable. Judge Kaczynski, I think that's exactly what all the amici are saying. This is a dramatic thing to allow individuals who have second thoughts or alleged mistake to be able to force take-downs of speech. Right now is a massively interesting time in the time of speech. You know, YouTube every minute is uploading 300 hours of video. So just in the past, you know, since this oral argument began, it's been about 9,000 hours that have been uploaded just to YouTube alone. That is about 6.5 million five-second snippets. And if any of those people and any of those could allege that they were the subject of fraud or something, all of that speech is going to come down. The news organizations are saying, the New York Times, LA Times and stuff are saying, we can't then host that information. We can't link to it. We'd be too worried. That's a dramatic approach. But would they then have to be in the position of determining what a work was? That's exactly right. You know, you put intermediaries in this very difficult position of trying to adjudge copyright and who's right and who's wrong and who's right on the fraud and not. The simplest way to deal with this is to say, look, she needs to have a high standard under Winter and even a higher one under the triple ratcheting up. And this idea about work, that it can be fragmented a thousand different ways, just can't possibly be the law. Does she even have a claim of damages against YouTube? A claim for damages? I'm not sure she's even asserting this, but if she is, we don't. So I don't understand how you're saying they're afraid to do it. I mean, they might get an injunction, but that's quite, I mean, we're just making it sound as if they're afraid to put it up because they might be held liable. She doesn't have a liable. I think she does, actually. Now I'm thinking about count two of her complaint is an action for damages. Against YouTube? Against YouTube. I believe that's right, that it's contributory infringement and things like that. The argument you make that YouTube is going to have this burden, the reality is under the DMCA that third-party hosters already have a certain burden by law. So I don't know that this case, were we looking at it under that construct, would be an issue. Well, I think that the DMCA was crafted really with a, I think, a regular view of copyright law in mind, as opposed to this innovative one, in which, I mean, it's ordinary works. It's take down the Hunger Games because Warner Brothers is making a request. Right, but when you get the takedown notice, you Google or whomever, a judgment has to be made. Absolutely, but then there's a counter notification process and the like. Our point and the point of all the amici is that DMCA process does not work. It's not geared to individual five-second performances. Just the massive sheer scale of that will be very different. And the ultimate effect is going to be to really harm the marketplace of speech. And this Court's decision in Overstreet says if there's any risk of that, then you can't allow the preliminary injunction to proceed. Does fraud have no impact at all, then, on an implied license or copyright interest? Well, we think that you don't even have to get, Judge Maria, to the implied license or something like that. We think this case is most simply decided on the idea that this is not a work, that a five-second performance is part of an overall work in a sense of Muslims, but that you can't claim a copyright in an individual sliver. And then the second thing, which we haven't talked about yet, but picking up on Judge Smith's question about al-Muhammad is, even if that five seconds is somehow a work, she's not the author of that five seconds. So we think that implied license is there and, you know, I'm happy to talk about it. What if it's a human cannonball? Excuse me? What if it's a human cannonball? You remember that case? I don't know that case. I'm sorry. It's a Supreme Court case. I thought you knew every Supreme Court case. Not all of them. Not all of them. But if you could... Well, I'm trying to remember the name of the case. It was Zaccherini. Zaccherini. Italian name. Zaccherini. And the whole point was that he had a five seconds, or perhaps less performance, a human cannonball, and it was all put on television. So essentially the Supreme Court said you can't steal an entire performance because the whole thing is five seconds. I mean, sometimes five seconds can be... I mean, we mentioned Celine Dion, right, who I gather was a singer. In fairness, that was a right of publicity case, though, right? It was a right of publicity case, yeah. So absolutely, you know, Judge Kuczynski, our position is not that a five second video can never be a work. It can. The question is, as I was reading to you from before from Section 101, when she entered the performance, was it intended to be part of a merged, was it intended to be merged or an independent, separate work? And so if... So walk me through, how is Celine Dion different from Cindy Garcia? Because I take it Celine Dion was anticipating at the time that the song was going to be used in two things. One, as part of the movie Titanic, and two, as part of an independent song that she would sing and market on her own. Or with her, whatever, her producers. Creating the soundtrack and releasing a single, basically. Exactly. And so that's exactly what Ms. Garcia can't show here, which is this idea, I mean, she showed up to do the movie. And by the way, the fact that there are three and a half days... Presumably what you assume about Celine Dion is papered in, between her and Warner Brothers and whoever else produced the movie, right? The problem here is there was no paper. And a producer is always able to avoid these problems by producing an agreement and so on. But what happened here is there was no agreement. Well, I'd say two things. Number one, there actually was, and that's part of one of our arguments for why we thought that the panel's decision was wrong, is that there is this assignment in this case and a question about whether or not that's valid. And given that evidentiary dispute, we thought the proper course of action would have been to remand to the district court instead of entering a preliminary injunction right now that gags speech. And number two, Ms. Garcia has never alleged, Judge Kaczynski, to my knowledge, that she intended her performance to be a standalone, separate work. She could have put that in her complaint. She could have put it in her briefs. It's not anywhere in there. And that is what the precondition is for a work under Section 101. So that's our problem with work. Our problem with authorship, as Judge Smith was saying, was that the al-Muhammad case, and not just al-Muhammad, but Burrough-Giles, the Supreme Court case, says that you've got to be the creative mastermind behind that, the kind of main driver. And Ms. Garcia, even again, taking all her allegations at face value in her complaint, look at paragraph 5 in which she says, Youssef is the writer and the director. Youssef is the one who script. Youssef's the one who organized the stage and the performance. And so in that circumstance, Ms. Garcia is not an author, even of the five-second performance. »» What about the three and a half days that she worked on it? »» Exactly. I heard my friend making that argument. That doesn't matter. She's not asserting a copyright interest in the three and a half days. And she's only asserting a copyright interest in the five-second performance. And that, of course, is what the panel's injunction goes to. »» But she did. I mean, she, counsel, did. When she was at the lectern, I thought she said she had the three and a half day performance. She sort of by proxy didn't know how long it was when they, because they only had the clip. So they made a reference to the clip, but they meant to refer to the entire performance. »» Judge Kaczynski, I suppose that if Youssef had posted the other three and a half days of that stuff on YouTube or something like that, maybe that would be before this court. But what's before this court is simply the 13-minute, 51-second trailer. »» Not so fast. I mean, what she's saying is, look, I'm claiming a copyright interest in the three and a half days of performance, five seconds of which was stolen and put in this movie and included in this movie, which is on YouTube. »» But we really don't have a tangible medium of expression, do we, when we're talking about it? »» It might or might not exactly, Judge Smith, be fixed. Our central point on joint authorship is this. Even if you look at al-Muhammad, in which Mr. al-Muhammad did so much central contribution to the work, so much so that Denzel Washington even testified that he was a great contributor to the work, even he wasn't enough to be a joint author. But if he were a joint author, even with all that, he couldn't have had the rights that Ms. Garcia is seeking here. A joint author cannot get an  entire film in joint. »» She's not claiming to be a joint author. Opposing counsel explained that. She claims the right in her performance. She can't get the whole film in joint, and she didn't. She only got the five seconds in joint. »» That's exactly our point, Judge Kaczynski. »» It sounded like you were making a very different point. »» No, that's exactly our point, that the power that she's seeking is the power to do what a joint author can't do, which is stop a film. And yes, Judge Kaczynski, you're right. Your injunction only bound the five seconds as opposed to the entire movie. But for the reasons that are in our contempt briefing before this Court have explained, you can't excise just a five second performance. »» You could if you were an independent contractor under a specific license, could you not, if you have a specific contract? »» Sure. If you were the individual person writing the material, but a third party like YouTube can't do that, both technically and because it bumps up against other rights. »» Would you clarify one thing that is not clear to me from the record? I see some reference in the briefs to the fact that although there was a takedown notice and then ultimately a mandatory injunction, that this movie still remained elsewhere on the Internet because it, of course, had been released prior to the time the Ninth Circuit panel issued its order. »» Right. It's certainly not on  Google's, on YouTube's platforms. »» I understand that. »» But I think that's exactly right, and it's another reason. The district court said they denied the injunction here because of the irreparable prong part, which is, we admit, Ms. Armento's strongest argument. What the district court said is, as Judge McCune pointed out, the toothpaste is out of the tube at this point for two reasons. Number one, the speech, as you were saying, Judge McCune, is available on other platforms. And number two, Ms. Garcia is not in the public eye. There's been millions of things, millions of downloads and so on. And so for that reason, the district court said, I can't repair this harm. The injunction can't repair this harm. The toothpaste is out of the tube. And again, we might think that that's a debatable proposition, but this Court's precedents say you can only review that on an abuse of discretion standard and find that clear. »» But you said that's her best argument. Isn't money the only thing that's going to fix it? »» Fixing money? »» Getting money. »» I'm not sure if money before this Court, we're only here on the preliminary injunction and the winter standards. »» Right. But if money is good enough, you don't issue an injunction, right? »» That's correct. And I suppose that argument is available as well to say that maybe money can redress that, money can solve this horrible... »» You're not making that argument, I presume. »» We're not making that argument. We're making the same argument that the district court made. And indeed, I should say the same argument that this Court in perfect 10 accepted. Because in perfect 10, this Court said that a district court's denial of a preliminary injunction was valid because of the irreparable harm prong couldn't be met. Why? Because, as this Court said, quote, search engines other than Google contribute to making these perfect 10 naked images freely available. That's exactly our point here. It's exactly the district court's point here, which is, you know, you can't enjoy YouTube all you want, but these images are out there, and Ms. Garcia's role in the film is out there as well. And so for that reason, you can't repair this harm. And again, that's only one of the four winter factors we think it's her strongest. The public interest, the balance of the equities, for all the reasons about how speech is at stake here, about how this panel's decision will fragment copyright into a way that nobody has ever seen before, is all, I think, weighing very heavily as well. »» Counselor, do we really have to set in line all of the copyright law in this particular case, given that this is a mandatory injunction and that it's an abuse of discretion standard? If we were to say, instead, that doesn't seem likely this person will be able to succeed on the merits, and we really can't get there as to the irreparable harm, do we really have to set in order all of the copyright law as the amici have suggested and that you seem to be suggesting? »» Well, Judge Smith, I think we at least have to set it back right. And that is to remove this panel decision, which has, I think, a wrong view of work and a wrong view of authorship. You're right, absolutely, to say the standard review alone is enough to decide this case for YouTube. But I guess I would caution the court that this language about work and authorship hanging out there, as the amici are pointing out, is very, very damaging. There is no precedent, as to return to a conversation I was having with Judge Kaczynski earlier, there is zero precedent for the idea that a work can be splintered and fragmented in these ways, and it will do untold mischief if that is allowed to be the law of the land. »» If we were to try to set copyright law straight, do you think that's a good thing? I mean, I'm not sure how Alma Hodman was correctly decided. You've read the criticism of that. It's inconsistent with Bower's. It's in tension with Richland. What's your response? »» We don't think the court should get into that whole Alma Hodman issue from that four-person academic brief. I mean, that's really an academic brief. I mean, as Judge Kaczynski was saying, she's not alleging joint authorship here. And even if she were, it wouldn't matter because joint authors can't get injunctions. So I would definitely caution the court not to get into that whole question. »» But if there is a tension in our case law and we're sitting on bunk, we probably ought to resolve it. »» Well, I think maybe, but I caution the court about resolving it in this particular case. I'd point out, for example, the parties haven't even had an opportunity to brief this question. It only comes up in a late-breaking amicus brief. But if you did really want to get into it, I think that you would have to confront the fact that Thompson v. Larson, the Second Circuit decision, is squarely on point with Alma Hodman. And if you did revisit it, you would be prompting a circuit court split on that question. And this case, a preliminary injunction case, seems to me the worst place to do that because the standard, the question you're asking is, is it clear in the law that she is right? And I think by definition, even if Alma Hodman should be overruled, it's not clear in the law that's a really, I think, high standard to meet. But overall, our standard review here requires clearly a clear showing on the facts in the law. We think neither are met here. And we think with all due respect to the panel decision, it needs to be reversed on the merits. »» I think I heard another question down here. Very good. Any further questions? Thank you. »» I'd like to address first the issue of standard of the prohibitory versus mandatory. I don't agree that this is a mandatory injunction, but here's why. A mandatory injunction asks someone to affirmatively do something. So, for instance, in Section 503 of the Copyright Act, where you can ask for an impoundment, go and get all the things that were infringed. That looks mandatory. Prohibitory looks more like Section 502 of the 1976 Copyright Act, where it says that a court may grant injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright. All Ms. Garcia, all the panel really decided was to stop further infringement. It didn't issue, for instance, a recall on the product. So if we compare this case to Maryland Nutraceuticals, in that case, there was also a mixed injunction issue. There was a stop selling the product further and there was a go recall the product. Go recall the product was mandatory and it was denied. So, stop selling the product was prohibitory. Stop infringing copyright further. And despite the fact that Google's technology means that they're constantly infringing because the rat's always on the wheel and they keep turning. It's altering the status quo, though, isn't it? Well, that, of course, because injunction is equitable, one needs to really look at what it is that we're doing. It so happens in their case it alters the status quo because their status quo is that they've created a law that says if we alter the status quo, it's a mandatory injunction. There's case law that says you have to look at each case and decide whether you think it feels more like mandatory or more like preliminary. And that's prohibitory. But to answer Judge Murguia's question, isn't there case law that says we look to see whether the status quo is altered in order to determine whether or not it's mandatory? Yes, there is. But I don't think it's dispositive. And it also says you look at the facts to determine that. So you would say that this is really akin to a traditional copyright case in which an injunction is entered, which is really prohibitory, which is just quit violating my copyright. Sure. Which is just a standard copyright case. If we were looking at a movie theater that kept putting the movie in, and we said stop doing that, that seems like prohibitory. It just happens that they've created a machine that keeps putting the movie in. We're just saying stop running it. That's it. That, to me, looks prohibitory. Now what if you say, well, stop doing this, but actually to do that, you can keep running your film, but you must take affirmative action to excise a portion. Does that change the calculus? I mean, it starts to look a little bit more like mandatory. I have to admit that you're asking someone to stop running their machine. But we know from Google that for them it's a very simple thing to do. The court has done that before at the declaration of Zahara Levine, the associate general counsel of Google. And they say that within 24 hours they can take down infringing content, 85% cases. They also employ a worldwide team around the globe that in 24 hours can manually take down the other 15%. So we're not asking them to do something that is so extraordinary and such a burden that they don't already do every single day, every single second. It's not like we're asking them to formulate some strange product recall of which they have no experience. It's really not much of a burden. I'd like to talk about the fragmentation issue that came up in the example of Celine Dion. So counsel's argument is that if Celine Dion was making a track and she sent it over to the movie, then she would own the copyright in that. But what if Celine Dion happens to be on the set of Titanic, and she is singing, and she creates a song? Okay. So she intended it as part of the unitary whole. Now suppose the producers of Titanic, having no writing, they take that movie, or they take that track, and they start selling it to, oh, I don't know, you know, triple X video folks. They use it as tracks for pornography or for religious things that are offensive to her. Would we agree that she participated in the unitary whole? So too bad. Is that a derivative work in that case? I'm sorry? Is that a derivative work under the copyright law, what you're just describing? I think you would look at the intentions of the parties, first of all. Is it a derivative work? Is it her derivative work? No, because it's the same song. They just put it somewhere else and did something horrible that she didn't approve of. The unitary whole, where the district court got it wrong, and I think counsel's mistaken, is the unitary whole is not Desert Warrior. That's the property. So the issue is when she took her performance, her Celine Dion track. Could you just step back? I'm still maybe not tracking that portion of it. When you say it's not Innocence of Muslims what was put up, in effect, ultimately, by the movie maker, filmmaker, it's Desert Warrior. And is that based on the fact that she signed up to do something for a desert warrior or some other basis? That and based on the circumstances and what she was told about what she was doing. So as an example, Your Honor may be familiar with the case that involved a piece of a quilt that was used as a prop in a movie, and the court held that that was entitled to protection. There was a quilt, it was taken, it was put in a movie, and there was a copyright interest in the quilt. It happens all the time in Hollywood or TV shows when we're clearing lights. We look at, you know, there's a painting on that wall. When you look at trademark, copyright, everything that's put into the movie. Sure, is there clearance on that painting? But that's different than a performance, isn't it? Well, with a performance, when we look at the performance... Is that a work? Is the quilt a work? I'm sorry? Is the quilt a work? In that case it was, Your Honor. It was. I mean, the courts have come up with... Let's take an example of stock footage where someone takes a picture of an unidentifiable person and they get used again and again maybe as stock footage. Your argument would be, if it's used for an improper purpose or one to which the actor in the stock footage did not agree, then that's protectable and you can seek an injunction if it's used. No. No, not correct, Your Honor. Why? What I would say is that you have to look at the scope of the license. That's the touchstone. It's the intent of the parties. That's what forms a paparazzi. And in the license agreement, say, you can use that for 24 hours. I realize that, but we're saying I'm assuming the absence of any license except for implied. If there's no license, then you have to look at the circumstances. What did I show up for? Oh, do I show up every week for this producer who's making lots of different movies? Do I know or do the circumstances show that this is a movie who makes controversial movies? Or am I showing up to this at a Disney? Am I showing up to Oliver Stone's? Under that argument, just to make clear, then, is that third-party hosts basically are at risk for thousands, millions of individual claims based on circumstances, as you put it, that are considered after the fact. Is that right? So each one of them would have a copyright claim and would be subject to being able to have a takedown. They're at risk only in so far as they ask the uploaders to warrant that the property belongs to them. If it doesn't belong to them and someone complains, they have a very simple process, which they worked very hard to get through Congress, which is all called the free pass card, the DMCA. All they have to do is follow the procedures of the DMCA. They can put it in the hands of the uploader and the copyright claimant. And once they follow those procedures, they're absolved of liability. They don't need to have this fight. It's very strange and unusual that we're here, because normally you get a DMCA notice, it gets taken down or it doesn't, you get a counter notification, and you let those two parties have the fight. So it's an unusual, indeed, under the DMCA, that not only is Google and YouTube here claiming that this creates enormous liability, we're only here because they didn't take it down or issue a counter notification. Had that happened, there would be no issue here. But for some reason, Eric Schmidt, this chairman of Google, got up on the table and said, we are not taking it down, issuing some kind of a content based decision, which is kind of hard to understand in light of the vast immunities granted under the DMCA. Given the status of this case at this particular point in time, I believe I asked you this the last time at the argument. It seems to me that for me to undo what the district court did, which is no injunction, and the fact that I have to give that district court decision deference and find an abuse of discretion. I've got to buy your argument, haven't I? I can't just think, oh, it's a good argument. Because if I find myself finding that your argument might not be correct, then you don't have a high probability of success. And so, therefore, at that point, I've got to give discretion or deference, if you will, to the district court, don't I? You have to determine, DeNovo, where the trial court identified the correct legal rule. If the trial court legal rule that he did not find. He did not, in our view, he did not find that she had a copyright interest. He did not apply the correct legal rule. He assumed it was part of your argument. But if he decides that there's not a likelihood of irreparable injury, why does he have to deal with any other issue? He decides there's not a likelihood of irreparable injury. Assuming that is logical, given the evidence before the court. It's extraordinarily logical. He made the observation that it's been out there forever. He made the observation that it was there since July, but the evidence showed that the death threats only came after the Benghazi incident occurred. The death threats only came after the views became 30 million in numbers. Is there anybody in the world who doesn't know that your client is associated with this video? Maybe in a cave someplace, and those are the people we worry about. But the district court seemed to me to say no irreparable injury, no likelihood of success on that. And if he says that, what else does he have to say? I would disagree with the conclusion. Oh, you disagree with the conclusion. But if he says that, isn't that the end of it? No, because this court's duty is to decide, if the court decides that he has to decide whether the record supports the district court's conclusion that there was no irreparable harm is logical and plausible. And we learned that from Park Village. There is still a standard. The district court just can't say that. It has to be supported by the evidence, at least to some extent. And do you think Omohama just correctly decided? I'm not sure that I agree with the mastermind language, and I think it's been used a bit expansively, at least the way I see it in the briefs that were filed before this court. I don't think it was incorrectly decided, but I think there's language in there that's been subject to some manipulation that I think could be harmful in the future to performers' rights. Any further questions? Thank you. Thank you, Your Honors. The case is submitted for decision. Thank you both for your arguments. We'll be in recess.
judges: Thomas, Kozinski, Silverman, McKeown, Berzon, Rawlinson, Clifton, Callahan, Smith, Murguia, Christen, Watford